**CITY OF PORTLAND, a Municipal corporation, Plaintiff,**

v.

**The BOEING COMPANY, a Delaware corporation; and Cascade Corporation, an Oregon corporation, Defendants.**

**No. CIV.99–1761–AS.**

United States District Court, D. Oregon.

March 7, 2001.

Terence L. Thatcher, Office of City Attorney, Portland, OR, Rodney L. Brown, Gregory T. Costello, Martin & Brown LLP, Seattle, WA, for Plaintiff.

David A. Bledsoe, Perkins Coie, Aaron C. Courtney, George Wayne McKallip, Jr., Sussman Shank Wapnick Caplan & Stiles,

Daniel L. Keppler, Kennedy Watts Arellano & Ricks LLP, Richard S. Pope, Jack B. Schwartz, Newcomb Sabin Schwartz & Landsverk, Portland, OR, for Defendants.

## OPINION

ASHMANSKAS, United States Magistrate Judge.

Presently before the court are cross-motions for partial summary judgment. The City of Portland ("Plaintiff") asks the court to find that defendants the Boeing Company ("Boeing") and Cascade Corporation ("Cascade") collectively ("Defendants") are liable parties under the Comprehensive Environmental Responsibility, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*) ("CERCLA") and Oregon's "Superfund" statute (O.R.S. 465.200 *et seq.*) ("Superfund") for all of Plaintiff's necessary response costs to be determined at trial. Additionally, Plaintiff seeks a finding that Defendants have created, and are liable to Plaintiff for, a public nuisance. Defendants move the court for summary judgment on Plaintiff's claims for natural resource damages pursuant to Oregon's Superfund and for ultrahazardous activities. Finally, Defendants ask for a determination that Plaintiff is limited to claims for contribution under 42 U.S.C. § 9613 and O.R.S. 465.257 and for dismissal of Plaintiff's claims for cost recovery under 42 U.S.C. § 9607 and O.R.S. 465.255.

## BACKGROUND

Plaintiff owns and operates a large well field in East Multnomah County which it uses primarily as an emergency back up and a supplement to the Bull Run River (the "Wells"). The Wells are located near property owned and operated by Defendants (the "Facilities"). In the mid-1980's, groundwater contamination was discovered on the Facilities near the Wells. While none of the Wells was contaminated,

the existence of contamination in the groundwater prevented Plaintiffs from utilizing the Wells to capacity, forcing them to obtain alternative water supplies and impose water restrictions, and caused Plaintiff to incur substantial costs in re-·sponding to the immediate threat to Plaintiff's water supply.

This court has found that Defendants use of the industrial solvent TCE resulted in the contamination of the groundwater and the Facilities and have held Defendants liable under CERCLA for such contamination. In this action, Plaintiff seeks to recover all of its damages generated by the contamination.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary judgment:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "[T]he requirement is that there be no *genuine* issue of *material* fact." *Anthes v. Transworld Systems, Inc.*, 765 F.Supp. 162, 165 (D.Del.1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (emphasis in original).

The movant has the initial burden of establishing that no genuine issue of material fact exists or that a material fact essential to the nonmovant's claim is absent. *Celotex v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the onus is on the nonmovant to establish that there is a genuine issue of material fact. *Id.* at 324, 106 S.Ct. 2548. In order to meet this burden, the nonmovant "may not

rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Factual disputes are genuine if they "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. On the other hand, if after the court has drawn all reasonable inferences in favor of the non-moving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

## DISCUSSION

### First Claim for Relief—Nuisance

In its First Claim for Relief, Plaintiff alleges that Defendants disposal of TCE into the groundwater constitutes a public nuisance. In making this claim, Plaintiff relies on O.R.S. 448.265, which provides:

> (1) It shall be unlawful for any person to do any of the following if the result would be to pollute a source of a water system or to destroy or endanger a water system:
>
> (a) Establish or maintain any slaughter pen, stock-feeding yards or hog-pens.
>
> (b) Deposit or maintain any uncleanly or unwholesome substance.
>
> (2) Violation of subsection (1)(a) or (b) of this section is a public nuisance and may be abated as other nuisances under the laws of this state.

In its summary judgment motion, Plaintiff cites O.R.S. 468B.020 as additional authority for its public nuisance claims. O.R.S. 468B.020 provides:

(1) Except as provided in O.R.S. 468B.050 or 468B.053, no person shall:

(a) Cause pollution of any waters of the state or place or cause to be placed any wastes in a location where such wastes are likely to escape or be carried into the waters of the state by any means.

(b) Discharge any wastes into the waters of the state if the discharge reduces the quality of such waters below the water quality standards established by rule for such waters by the Environmental Quality Commission.

(2) No person shall violate the conditions of any waste discharge permit issued under O.R.S. 468B.050.

(3) Violation of subsection (1) or (2) of this section is a public nuisance.

Plaintiff alleges that, as the owner and operator of a number of wells that have been affected by the TCE deposits, it is entitled to damages for the public nuisance created by Defendants. Plaintiff seeks summary judgment on this claim.

Defendants argue that Plaintiff is not entitled to pursue a private right of action for a public nuisance under either of the statutes quoted above. In support of this argument, Defendants point out that both of these provisions are "are included with broader statutes that establish comprehensive regulatory and enforcement regimes for *state* agencies" and that Judge Stewart of this court held, in *City of LaGrande v. Union Pacific Railroad*, CV No. 96–115–ST (Opinion issued July 18, 1997), that comprehensive regulatory schemes do not create private rights of action for damages for persons other than the State of Oregon. Judge Stewart did find that O.R.S.

466.640 did not create a private right of action but also specifically held, in that same case, that "defendant's alleged violation of O.R.S. § 468B.025(1) creates a nuisance *per se*," *City of LaGrande*, supra, at 28, and allowed the city to proceed on its common law public nuisance claim.

■ Even if Defendants are correct that Plaintiff may not pursue a private action to enforce the regulatory schemes set forth in O.R.S. 448.265 or O.R.S. 468B.020, it is clear from Judge Stewart that it may pursue a common law public nuisance claim based on activity declared by the state legislature to be sufficiently hazardous to qualify as a nuisance *per se*. This conclusion is supported by the legislative statement that the authority granted to the Environmental Quality Commission to enforce the provisions of Chapter 468B, "shall not prevent the maintenance of actions for legal or equitable remedies relating to private or public nuisances brought by any other person * * *."

■ Defendants also contend that Plaintiff lacks standing to assert a private claim for a public nuisance. Generally, only the state can bring a cause of action against the party responsible for the public nuisance. *Frady v. Portland GE*, 55 Or. App. 344, 637 P.2d 1345 (1981). However, where a private party can establish that it has suffered an injury of a special character separate and distinct from that suffered by the general public, a claim for private recovery on a public nuisance will exist. *Id.* at 348, 637 P.2d 1345. Oregon has held that a private party who owns land that is affected with a public nuisance will have a private action. "When a public nuisance interferes with an individual's right to use and enjoy his real property, the individual suffers special injury and may bring an action against the perpetra-

tor of the nuisance." *Id.* at 349, 637 P.2d 1345.

■ Defendants argue that a genuine issue of material fact exists with regard to whether any of the chemicals used by Defendants are responsible for the contamination of the groundwater near the Wells and that, consequently, Plaintiff is unable to establish that it suffered a special injury as a result of Defendants conduct. However, the record is clear that Plaintiff incurred costs by engaging in action to determine the extent of Defendant's contamination and the appropriate means of protecting the Wells and groundwater from the spreading of the contamination. These costs are unique to Plaintiff as an owner of property in near proximity to Defendants' Facilities and are adequate to establish a special injury. What remains to be determined by the trier of fact is the amount of damages incurred by Plaintiff as a result of Defendants, use and disposal of TCE.

Defendants contend that their comparative negligence defense prevents this court from issuing summary judgment for Plaintiff on their nuisance claim. Defendants appear to argue that if they can establish that Plaintiff was at least 51% responsible for the damages they are seeking in this action, Plaintiff is barred from recovering anything against Defendants on the nuisance claim.

The court has not found, and the parties have not cited, any Oregon case that applies the defense of comparative negligence as a bar to a nuisance claim. In *Furrer v. Talent Irrigation District*, 258 Or. 494, 515, 466 P.2d 605 (1970), the Oregon Supreme Court acknowledged the tendency of courts to "reject the doctrine of contributory negligence in cases where the defendant interferes with the landowner's use and enjoyment of his land." The court then found that a jury instruction, which

required the plaintiff to use reasonable care in the use of his property to avoid loss and prevented a plaintiff from recovering "for losses which could have been prevented by reasonable efforts on his part," gave the defendant all the protection he deserved in a nuisance action. Five years later, the Oregon Supreme Court again noted that there generally was no opportunity for contributory negligence in nuisance cases and held that where it can be shown that plaintiff himself caused part of the damage to his land as a result of his response to the nuisance, the defendant would be entitled to apportion the damages based on the harm cause by each party. *Phillips Ranch, Inc. v. Banta*, 273 Or. 784, 792, 543 P.2d 1035 (1975).

■ The court finds that Defendants' affirmative defense of comparative negligence is not a bar to Plaintiff's nuisance claim. If Defendants are able, at trial, to establish that Plaintiff's reaction to the contamination contributed to the damages caused by the contamination, Plaintiff's damages will be reduced accordingly.

Finally, Defendants contend that Plaintiff's nuisance claim is barred because Plaintiff "had ample warning that a large well field in the Columbia South Shore could become contaminated because of the location of industry and septic systems and the interconnected nature of the aquifers." Defendants then ask for "additional time to develop discovery of further information in order to buttress their 'coming to the nuisance' defense."

The Oregon Supreme Court first adopted the coming to the nuisance defense in *East St. Johns Shingle Co. v. Portland*, 195 Or. 505, 246 P.2d 554 (1952). The court restricted the application of the doctrine to a nuisance action filed against a municipality by a private company operating for profit that set up its business adja-

cent to public waters long used for the disposal of sewage, offal and other wastage by the city and other nearby industries where the nuisance was known or should have been known to the company and was not made worse after the purchase of the property. *Id.* at 563. The court explained that it should be the policy of the law to at all times protect within reason the state's municipalities against such contingencies. The same court refused to apply the defense to a nuisance action brought by homeowners against the owner of a livestock feedlot in *Spencer Creek Pollution Control Assn. v. Organic Fertilizer Co.,* 264 Or. 557, 505 P.2d 919 (1973). The *Spencer Creek* court based their decision on the lack of evidence showing that the nuisance existed at the time the plaintiffs purchased and occupied their property. The court stated that while it was clear that the feedlot was in operation at the time of the purchase, the extent of the interference with the surrounding properties was not known. *Id.* at 561, 505 P.2d 919.

■ Defendants are not municipalities and, therefore, do not fall within the boundaries of the defense created in *East St. Johns Shingle.* The Wells were planned in the 1970s and constructed in the early 1980s. Defendants were not aware of the contamination until 1985. The evidence establishes that no one was aware of the extent of the interference by the nuisance at the time Plaintiff purchased and planned the Wells. The coming to the nuisance defense does not apply in this instance. Plaintiff is entitled to summary judgment with regard to Defendants' liability on the nuisance claim. The amount of damages attributable to Defendants' nuisance remains to be determined by the factfinder.

**Third Claim for Relief—Cost Recovery under Oregon Law**

**Fourth Claim for Relief—Cost Recovery under CERCLA**

In its Third and Fourth Claims for Relief, Plaintiff seeks to recover the costs it incurred in responding to Defendants' release of hazardous materials from the Facilities. The parties agree that the Oregon legislation should be construed consistently with CERCLA. Accordingly, the court will first address Plaintiff's claim for cost recovery under CERCLA.

■ Defendants claim that Plaintiff's claim for cost recovery is barred by the applicable statute of limitations. The statute of limitations for cost recovery actions under CERCLA is found at 42 U.S.C. § 9613(2)(g), which provides:

An initial action for recovery of the costs referred to in section § 9607 must be commenced—

(A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) for continued response action; and

(B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

This same statute of limitations applies to claims for contribution under section 9613(f)(1) where, as here, the plaintiff has initiated a contribution action in the absence of an initial judgment or order from which the contribution claim arises. *Sun*

*Company, Inc. v. Browning–Ferris, Inc.,* 124 F.3d 1187 (10th Cir.1997).

Defendants contend that the costs incurred by Plaintiff in response to the release of hazardous materials at the Facilities, if any exist, are properly characterized as remedial costs. Defendants argue that because Plaintiff began remedial actions as early as 1989, Plaintiff's filing of this action in 1999 was untimely. Plaintiff argues that they have incurred removal costs, not remedial action costs. The parties agree that the removal action at the Facility is not yet complete. Therefore, if the costs are properly characterized as removal costs, Plaintiff is not barred by the statute of limitations.

The term "removal" is defined at 42 U.S.C. § 9601(23) as:

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b), and any emergency assistance which may be provided under the Disaster Relief Act and Emergency Assistance Act.

The term "remedial" is defined at 42 U.S.C. § 9601(24), which provides:

The terms "remedy" or "remedial action" mean those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collections of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

The definitions of the terms are not mutually exclusive and clearly contain some ov-

erlap. The courts, however, have generally viewed removal actions to be those short-term actions taken immediately to halt the immediate risks posed by hazardous wastes. Removal actions are generally initiated first and involve the monitoring and studying of the hazardous waste release and the consideration of various clean-up solutions. *Fairchild Semiconductor Corp. v. United States Environmental Protection Agency*, 769 F.Supp. 1553, 1555 (N.D.Cal.1991) (citing *Barmet Aluminum Corp. v. Reilly*, 927 F.2d 289, 291 (6th Cir.1991) and *Schalk v. Reilly*, 900 F.2d 1091, 1092, n. 1 (7th Cir.1990)). Remedial actions are viewed as the more permanent remedies taken over an extended period of time to permanently eliminate the ongoing danger of the hazardous wastes. These actions are generally taken after the EPA has agreed upon an appropriate remedial action for the specific hazardous waste release at issue. *Id.* The definitions of the terms and the cases construing those definitions demonstrate that it is more the general characteristics of the actions, rather than the particular acts taken, that define whether a party has incurred removal or remedial costs.

█ Plaintiff began monitoring and collecting data with regard to the threat of contamination of the Wells in 1989. Between 1992 and 1993, Plaintiff constructed five wells, which it used to collect water level and groundwater quality data on a regular basis. The information collected by Plaintiff was used by Defendants to prepare its remedial investigation and feasibility study and was relied on by the DEQ when it issued its remedy selection on December 31, 1996. Plaintiff's activities were initiated shortly after discovery of the threat of contamination by hazard-

ous materials spilled by Defendants and involved the monitoring and studying of the hazardous waste release and the consideration of various clean-up solutions. This is the very type of activity envisioned by the definition and purpose of a removal action. The court finds that Plaintiff engaged in removal actions through 1996 and that this action was timely filed.

█ In order to establish a claim for cost recovery under CERCLA, a plaintiff must show that: (1) the defendant is a responsible party under section 9607(a); (2) the site in question is a "facility" as defined in section 9601(9); (3) a release or threatened release of a hazardous substance has occurred; and (4) the release or threatened release has caused the plaintiff to incur response costs that were necessary and consistent with the national contingency plan.[1] *Carson Harbor Village, Ltd. v. Unocal Corp.* 227 F.3d 1196, 1202 (9th Cir.2000). Defendants concede the first three elements of the claim. The only issue before the court is whether Plaintiff has established that it incurred response costs as a result of Defendant's release of hazardous materials.

█ Defendants argue that Plaintiff is unable to prove that it incurred any response costs as a result of Defendants' TCE spills. They contend that Plaintiff's damages are related to Plaintiff's improper management of the Wells and poor management decisions relative to the logging along the Bull Run River. Additionally, Defendants point to evidence that the Wells have been contaminated, or are in jeopardy of being contaminated, by hazardous materials from sources other than Defendants. Even accepting all of this as true, Defendants' arguments are more ap-

---

1. These are the *prima facie* elements for a claim under both section 9607(a) (cost recovery) and section 9613(f)(1) (contribution).

propriately directed to the issue of the amount of damages incurred by Plaintiff as a result of Defendants' activities. The record is clear that Plaintiff incurred costs in response to the threat of contamination from Defendants' facilities. Plaintiff joined Defendants and contributed over $200,000 to DEQ for the development of a means to monitor and evaluate the extent of Defendants' spills. Additionally, Plaintiff constructed five of its own wells and monitored the wells over a period of time to determine the extent of the spills and the degree of danger such spills posed to Plaintiff's water resources.

The court finds that Plaintiff has established a *prima facie* case for recovery of response costs under CERCLA. The only issue for the fact finder is the amount of such costs Plaintiff is entitled to recover from Defendants.

■■■■ The one issue remaining on the CERCLA claims is whether Plaintiff is entitled to pursue a pure cost recovery claim under section 9607 or whether Plaintiff is limited to a claim for contribution under section 9613. Section 9607(a) authorizes suits against certain statutorily defined responsible parties to recover costs incurred in cleaning up hazardous waste disposal sites. *Catellus Development Corp. v. L.D. McFarland Co.*, 910 F.Supp. 1509, 1514 (D.Or.1995). Under Section 9607, each responsible party is jointly and severally liable for any necessary costs of response incurred by an innocent party. *Id.* Section 9613 authorizes "an action by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make." *Id.* (quoting *United Technologies v. Browning–Ferris Industries, Inc.*, 33 F.3d 96, 99 (1st Cir.1994)). In a Section 9613 action, liability is several and the court is required to determine the fault of each party using equitable factors. *Id.*

Defendants argue that Plaintiff admitted that it was a potentially responsible party ("PRP") under section 9607 in the Administrative Order on Consent it entered into with the DEQ and EPA effective July 17, 2000 ("Consent Order"). Based on this status as a PRP, Defendants contend that Plaintiff is limited to a contribution claim and that such claim is subject to a number of affirmative defenses that require additional discovery. Plaintiff argues that the Consent Order is not binding on it in this action, that it is not an owner or operator of a facility and that Defendants have failed to prove that it incurred any response costs as a result of Plaintiff.

■■■■ In the Consent Order, the EPA and the DEQ make the determination that the Facility and a portion of the Wells is a "facility" as defined in Section 9601 and that Plaintiff is a "potentially responsible person" within the meaning of Section 9601. Paragraph 2.4 of the Consent Order provides that:

> EPA, DEQ and the City agree that neither this Consent Order, nor any part hereof, nor the entry into, nor any performance under this Consent Order by the City, shall constitute or be construed as an admission or acknowledgment by the City of the factual findings or legal determinations contained in this Consent Order or of any liability, fault, or wrongdoing, or as evidence of such, or as an admission of violation of any law, rule, regulation, or policy, by the City or by its officers, directors, employees, or agents.

Defendant is barred from using the statements in the Consent Order as an admission by Plaintiff. *United States v. SCA Services of Indiana, Inc.*, 849 F.Supp. 1264 (N.D.Ind.1994).

■■■■ Defendants also argue that Plaintiff is an owner or operator of a facility as

defined under 9601 and, is therefore, a potentially responsible party limited to a contribution claim. The definition of "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9)(B). The term "disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). The Ninth Circuit recently held that this definition encompasses passive migration. *Carson Harbor,* supra, 227 F.3d at 1206. Accordingly, the migration of hazardous wastes through groundwater is considered a "disposal" of waste under CERCLA. *Id.* at 1210.

 There is no dispute that a portion of the Wells has been contaminated by hazardous waste migrating through the ground from sources other than Defendants. Defendants argue that this makes Plaintiff liable under section 9607 as an owner of property where hazardous waste has come to be located. The court refuses to accept this broad interpretation of CERCLA. To do so would be to hold a party owning contaminated property liable for all contaminated property absent any relationship to the party or its property. The fact hazardous wastes have been found on a portion of Plaintiff's land is irrelevant in the absence of a showing that that particular release of hazardous materials cause Defendants to incur response costs. This is evident by the requirements of a section 9607 cost recovery action. There must be a release or threatened release of hazardous material and "such" release must cause the plaintiff to incur

response costs. Stated more clearly, before a party may be liable to another for response costs, the party seeking to impose liability must show that the alleged releases caused them to incur response costs that were necessary and consistent with the national contingency plans. *United States v. Iron Mountain Mines, Inc.* 987 F.Supp. 1263, 1268 (E.D.Cal.1997). Defendants have presented no evidence that it incurred response costs as a result of the migration of hazardous wastes onto Plaintiff's property from sources other than themselves. The fact that Plaintiff owns property contaminated by other sources does not make it a liable party under section 9607 in this action.

Defendants also claim that Plaintiff is liable as an operator of facility at which hazardous materials were disposed of. As long as Defendants are relying on its argument that the Wells are a facility because a portion of it has been contaminated by sources other than Defendants, the reasoning stated above still applies. Defendants can not base Plaintiff's liability to them on contamination lying under Plaintiff's property which originated from a secondary source and has not affected Defendants or their property in any way.

If we limit our review of the facts to those related to the action presently before the court, it is evident that Plaintiff is not liable to Defendants under section 9607. There is no evidence that any of the hazardous materials released at the Facilities migrated to property owned by Plaintiff. Consequently, the court finds that Plaintiff is neither an owner or operator of a "facility" for the purposes of this lawsuit. Even assuming that Plaintiff is an owner or operator of a facility from which a release or threatened release has occurred, there is no evidence that Defendants incurred any response costs as a result of the migration of the chemicals onto Plaintiff's property

or Plaintiff's drawing down of the Wells after the contamination was discovered. The court finds that Plaintiff is not liable to Defendants under section 9607 and is entitled to pursue a cost recovery action against Defendants. In light of this finding, the court dismisses Plaintiff's alternative claim for contribution under section 9613.

■ Section 9607 imposes strict liability on responsible parties subject only to the three affirmative defenses listed in section 9607(b), which require a defendant to establish that the act or omission alleged was caused solely by an act of God, an act of War or a third party. *United States v. Stringfellow*, 661 F.Supp. 1053 (C.D.Cal. 1987). Defendants have not alleged any of these three defenses and are not entitled to pursue any of the other affirmative defenses they have asserted in their answer.

Plaintiff is entitled to summary judgment on the question of Defendants' liability under section 9607 for Plaintiff's necessary costs of response consistent with the national contingency plan. The amount of such costs will be determined by the factfinder.

As noted above, the parties concede that, with regard to the issues addressed by the court above, the Oregon Superfund statutes would be construed consistently with CERCLA. Accordingly, Plaintiff is entitled to summary judgment on the issue of Defendants' liability for Plaintiff's costs under O.R.S. 656.255. The amount of the costs to be awarded Plaintiff remains to be determined by the factfinder.

**Fifth Claim for Relief—Natural Resource Damage**

Plaintiff's Fifth Claim for Relief seeks monetary damages for injuries to the Wells as a natural resource under state law. Defendants seek summary judgment on this claim asserting that the city, as a private party, lacks standing to pursue the claim and that the claim is barred by the applicable statute of limitations.

Plaintiff relies on O.R.S. § 465.255 in support of their natural resources claim. O.R.S. § 465.255 provides that PRP's are strictly liable:

for those remedial action costs incurred by the state or any other person that are attributable to or associated with a facility and for damages for injury to or destruction of any natural resources caused by a release.

The comparable federal statute provides that PRP's are liable for:

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 104(i).

42 U.S.C. § 9607(a)(4). In 42 U.S.C. § 9607(f), Congress specifically limited the plaintiffs in natural resource actions to natural resource trustees acting on behalf of the federal government, the state and certain Indian tribes. Municipalities may act as a natural resource trustees if so designated by the governor of the state. 42 U.S.C. § 9607(f)(2)(B). In the absence of such appointment, a municipality is not authorized to maintain an action for natural resources damages under 42 U.S.C. § 9607(a)(4)(c). *Town of Bedford v. Ray-*

*theon Company,* 755 F.Supp. 469, 475 (D.Mass.1991).

Defendants urge the court to construe the Oregon natural resources language consistently with the CERCLA natural resources language and limit natural resources claims to the United States, the states or Indian tribes. Plaintiff contends that the decision of the Oregon legislature not to include direction regarding those parties entitled to pursue natural resources actions in the Oregon legislation requires to court to find that any person may sue to recover for damages to a natural resource.

█ In interpreting a statute, a court looks first to the text and context of the statute before turning to legislative history. *PGE v. Bureau of Labor and Industries,* 317 Or. 606, 610–12, 859 P.2d 1143, (1993). The court is "not to insert what has been omitted, or to omit what has been inserted." O.R.S. 174.010.

At first glance, O.R.S. 465.255(1) appears ambiguous, or confusing at the least. However, when the separate clauses of the statute are identified and read independently, the statute is clear. Changing the mere structure of the sentence at issue results in the following:

(1) The following persons shall be strictly liable:

-for those remedial costs incurred by the state of any other person that are attributable to or associated with a facility; and

-for damages or injury to or destruction of any natural resources caused by a release.

Viewing the statute in this manner makes it apparent the clauses following the introductory phase, while modified by the introductory phrase, are exclusive of each other. This is supported by the repetition of the word "for" at the beginning of each clause. When viewed this way, O.R.S. 465.255 virtually mirrors the language of the federal statute, which allows any person to recover necessary response costs but lacks a designation regarding who may recover for "damages for injury to, destruction of, or loss of natural resources." It is appropriate for the court to construe the language of O.R.S. 465.255, consistently with its federal counterpart. This is particularly true in light of the clarification of the language provided by the Superfund Amendments and Reauthorization Act of 1986 ("SARA")[2], which was in effect at the time the Oregon legislature enacted its superfund statutes.

Plaintiff urges the court to apply the language specifically allowing the "state or any other person" to recover remedial action costs to actions for recovery of damages to natural resources. However, that interpretation of the statute does not evolve naturally from the statute as it was written. Had the Oregon legislature intended to allow "states and any other persons" to sue for natural resource damages, the legislature would have modified the statute to provide as follows:

(1) The following persons shall be strictly liable to the state or any other persons for:

-remedial actions costs attributable to or associated with a facility; and

-damages for injury to or destruction of any natural resource caused by a release.

█ The court finds, based on the unambiguous language of O.R.S. 465.255, that the Oregon legislature did not intend to

---

2. In SARA, Congress provided an express means for states to bring natural resource damage actions by permitting the states to designate "natural resource trustees." 42 U.S.C. § 9607(f).

allow private parties to sue for natural resource damages but, rather, adopted language similar to that found in CERCLA with the knowledge that standing to pursue such actions lies only in the United States, the States and Indian tribes. Defendants are entitled to summary judgment on Plaintiff's Fifth Claim for Relief for natural resource damages.

### Sixth Claim for Relief—Strict Liability

In its Sixth Claim for Relief for strict liability, Plaintiff alleges that Defendants' "methods of generating, handling and disposing of hazardous substances at the facilities under the circumstances of this case constituted ultrahazardous or abnormally dangerous activities." Defendants seek summary judgment on this claim asserting that this court has already held that Boeing's use of TCE at the Facility does not constitute an ultrahazardous activity.

■■■■ Whether an activity is abnormally dangerous is a question of law for the court. *McLane v. Northwest Natural Gas Co.*, 255 Or. 324, 327, 467 P.2d 635 (1970). An activity is abnormally dangerous in Oregon:

> only where it is "extraordinary, exceptional, or unusual, considering the locality in which it is carried on; when there is a risk of grave harm from such abnormality; and when the risk cannot be eliminated by the exercise of reasonable care."

*Buggsi, Inc. v. Chevron USA, Inc.*, 857 F.Supp. 1427, 1432 (D.Or.1994), quoting *McLane*, 255 Or. at 328–29, 467 P.2d 635. In *Cereghino v. Boeing*, 826 F.Supp. 1243 (D.Or.1993), Judge Jelderks applied this rule to defendant Boeing's activities at the facility in question and found that, based on the uncontroverted expert evidence that "it was entirely feasible to use both TCA and TCE in ways that would prevent any contamination of soil or groundwater", Boeing's use of TCE was not ultrahazardous and did not support a claim for strict liability.

Plaintiff does not disagree with Judge Jelderk's conclusion with regard to Boeing in *Cereghino* but argues that the finding is not applicable to Cascade or Boeing's predecessors. A careful reading of the opinion reveals that Cereghino's strict liability claim was asserted against all the defendants and that Judge Jelderk's opinion, while based on expert opinion evidence offered by Boeing, granted summary judgment for all of the defendants finding that the use of TCE and TCA did not constitute an ultrahazardous activity. This court finds that this ruling is equally applicable to both defendants in this case as well.

Additionally, Plaintiff argues that the definition of ultrahazardous activity created by *McLane* was modified by the Oregon Supreme Court in *Koos v. Roth*, 293 Or. 670, 652 P.2d 1255 (1982). It argues that the current test is "based on the magnitude of harmful events and their probability despite all reasonable precautions" and that where the Oregon legislature has stepped in and adopted stringent safety regulations for the use of specific products, the question of whether that a product is exceptionally dangerous is no longer before the court.

■■■■ This court has held on a number of occasions that the mere existence of legislation or regulations governing the use of dangerous products does not, in and of itself, determine whether an activity is ultrahazardous. *Buggsi*, supra; *Anderson v. Hanson*, CV No. 92–1632–ST, (F & R issued April 14, 1995, Adopted by Judge Frye on May 5, 1995); *City of LaGrande v. Union Pacific Railroad*, CV No. 96–115–ST (Opinion issued July 18, 1997); *Port of Portland v. Union Pacific Railroad*, CV No. 98–886–ST (F & R issued October 15, 1998, Adopted by Judge Pan-

ner on December 28, 1998). In her later cases, Judge Stewart identified the Oregon Supreme Court's new focus in strict liability cases to be "assessing abnormal hazards by their potential harm of magnitude or probability despite the utmost care." *City of LaGrande,* supra at 32 (quoting *Koos,* 293 Or. at 681–2, 652 P.2d 1255).

Here, it is uncontroverted that TCE could be used safely with reasonable precautions. The damage to Plaintiff's property was not caused solely by Defendants use of TCE, but rather, by Defendants use of TCE in a negligent manner. This is supported by Plaintiff's allegations that Defendants "methods" of using TCE "under the circumstances" was an ultrahazardous activity. The court finds that the use of TCE in a manufacturing process is not an ultrahazardous activity and that Defendant's are entitled to summary judgment on Plaintiff's Sixth Claim for Relief for strict liability.

## CONCLUSION

Plaintiff's motion (# 27) for summary judgment is GRANTED with regard to Defendants' liability under Plaintiff's First Claim for Relief for nuisance, Third Claim for Relief for cost recovery under Oregon's Superfund and Fourth Claim for Relief for cost recovery under CERCLA. The damages attributable to Defendants on these claims will be determined by the factfinder at trial.

Defendants' motion (# 38) for partial summary judgment is GRANTED with regard to Plaintiff's Fifth Claim for Relief for natural resource damages and Sixth Claim for Relief for strict liability.

Plaintiff's claims for contribution under Oregon's Superfund and CERCLA are DISMISSED.